IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2022

**STATE OF TENNESSEE v. LARRY DONNELL HIGGINS, JR.**

**Appeal from the Circuit Court for Madison County**
**No. 19-734     Donald H. Allen, Judge**

---

**No. W2021-00316-CCA-R3-CD**

---

Aggrieved of his Madison County Circuit Court Jury convictions of simple possession of marijuana, possession with intent to deliver not less than one-half ounce of marijuana, possession of a firearm with intent to go armed during the commission of a dangerous felony, and possession of a firearm after having been convicted of a felony crime of violence, the defendant, Larry Donnell Higgins, Jr., appeals, challenging the sufficiency of the convicting evidence and the denial of his motion for a mistrial. Because the trial court abused its discretion by denying the motion for mistrial, we reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Reversed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., joined. JILL BARTEE AYERS, J., filed a dissenting opinion.

Daniel J. Taylor, Jackson, Tennessee, for the appellant, Larry Donnell Higgins, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Matthew A. Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Madison County Grand Jury charged the defendant with alternative counts of the possession with intent to sell and the possession with intent to deliver not less than one-half ounce of marijuana, *see* T.C.A. § 39-17-417(g)(1); possession of a firearm with the intent to go armed during the commission of the sale or delivery of not less than one-half ounce of marijuana, *see id.* § 39-17-1324(a); and possession of a firearm after having been convicted of a felony crime of violence, *see id.* § 39-17-1307(b)(1)(A), based upon evidence discovered during a supervisory check of the defendant's residence.

At trial, Davie Miller testified that he was a probation and parole officer for the Tennessee Department of Correction and that he "work[ed] in the PSU unit which supervises registered sex offenders." On April 24, 2019, Mr. Miller traveled with three other probation officers, including Keiona Kirby, to 272 Talbot Street in Madison County to conduct a residential search of the defendant's reported residence. The defendant answered the door and permitted the officers to enter the residence. Four individuals that the defendant identified as "friends from work" "were allowed to go to the front porch" with one of the officers during the search while the defendant remained "in the common area of the house" with another officer. Mr. Miller and Ms. Kirby searched the residence.

During the search, Ms. Kirby discovered "a firearm, digital scale[s,] and a green leafy substance in a jar" in the oven in the kitchen. At that point, Mr. Miller patted the defendant down "to make sure he didn't have any kind of weapons and contraband and then I notified Jackson Police that we would need their assistance." Mr. Miller then searched the room the defendant identified as his bedroom and found ".22 caliber ammunition between the bed and the window" inside "a black gym-type bag in the floor." Photographs of the oven and defendant's bedroom were exhibited to Mr. Miller's testimony.

During cross-examination, Mr. Miller confirmed that the defendant was cooperative during the search and that Mr. Miller did not find any drugs, drug paraphernalia, or other weapons in the defendant's bedroom. Mr. Miller admitted that he did not know "at the time of the search," whether the defendant "had been living there a year or a week" because the defendant "was not under my supervision personally."

Keiona Kirby, a Probation Officer with the Tennessee Board of Probation and Parole, assisted Mr. Miller's visit to the defendant's residence on April 24, 2019. Ms. Kirby searched the kitchen, "searching the cabinets and the drawers" before she "opened up the stove" and saw digital scales, "a mason jar with marijuana in it[,] and a handgun." She advised Mr. Miller of her discovery.

Jackson Police Department ("JPD") Officer Robert Jaggars responded to Mr. Miller's call for assistance. Officer Jaggars photographed the contraband discovered by Mr. Miller and Ms. Kirby. Officer Jaggars described the firearm discovered in the oven as a 22-caliber revolver "with six rounds in the chamber." The 194 rounds of .22-caliber ammunition in the two boxes found in defendant's bedroom could have been used in the revolver found in the oven. Officer Jaggars testified that it was his experience, having investigated narcotics cases, that digital scales were used to weigh the drugs for purchase. Officer Jaggars collected the evidence and turned the items over to Officer Compton.

JPD Officer Corey Compton, who also responded to the defendant's residence, testified that he had been trained in basic narcotics investigation and had participated in "no less than" 25 cases involving the sale or delivery of marijuana and "over 100" misdemeanor drug possession cases. Officer Compton explained that the quantity of drugs and the presence of devices to measure and package the drugs can suggest that any drugs discovered were possessed for the purpose of selling or delivering them. The amount of marijuana discovered in the defendant's residence, some 24 grams, exceeded the typical amount possessed for personal use. Officer Compton said that the digital scale discovered alongside the marijuana bore clear signs it had been used to weigh the marijuana, explaining that in addition to the smell of marijuana, he observed a "green," "clammy" residue on the digital scale. Officer Compton acknowledged during cross-examination that he did not find any bags for packaging drugs or money in the defendant's residence.

Officer Compton testified that as he prepared arrest warrants related to the items discovered during the search, he learned that the defendant had previously been convicted of aggravated burglary, a Class C felony. A certified copy of the judgment of conviction was exhibited to his testimony.

Forensic testing identified the green leafy substance found in the mason jar as 21.3 grams of marijuana.

The State also played for the jury a 30-second portion of a telephone call placed by the defendant from the Madison County Jail on April 25, 2019. During the call, the defendant stated twice that there were people at the residence "trying to buy some weed" and that he did not want the police to discover a cellular telephone.

Following this evidence, the State rested. After a full *Momon* colloquy, the defendant elected not to testify but chose to put on proof.

Coan Thomas testified that he owned the house at 272 Talbot Street and that in April 2019, the house was leased to Heather Reeves and Darrell Rogers. Mr. Thomas could not recall when Ms. Reeves and Mr. Rogers moved into the residence but said that they had fulfilled a one-year rental agreement. Mr. Thomas said that the defendant was not part of the rental agreement and that, in fact, he did not initially know that the defendant had moved into the residence. He learned that the defendant was living in the house sometime after the defendant moved in but before Ms. Reeves and Mr. Rogers moved out.

Based on this proof, the jury convicted the defendant as charged of possession with the intent to deliver not less than one-half ounce of marijuana in Count 2; possession of a firearm with the intent to go armed during the commission of possession with intent to deliver marijuana in Count 4; and possession of a firearm after having been

-3-

previously convicted of a felony crime of violence in Count 5. The jury convicted the defendant of the lesser-included offense of simple possession in Count 1 and acquitted him of the possession of a firearm during the commission of possession with intent to sell marijuana in Count 3. The trial court merged the conviction of simple possession in Count 1 into the conviction of possession with the intent to deliver in Count 2 and sentenced the defendant, a Career Offender, to six years' incarceration. The court imposed sentences of 12 years and 30 years for the firearm convictions in Counts 4 and 5, and ordered the sentences to be served concurrently with each other but consecutively to the six-year sentence, for a total effective sentence of 36 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence and the trial court's refusal to grant his motion for mistrial.

## I. Sufficiency

The defendant contends that the evidence adduced at trial was insufficient to support his convictions, arguing that, given the presence of others inside the residence and the lack of DNA or fingerprint analysis, the evidence suggested that he was merely present in the house where the evidence was found. He also argues that the State failed to establish that the drugs were possessed with the intent to deliver because the police did not find plastic bags or money inside the residence. The State argues that the evidence was sufficient to support defendant's convictions.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[i]t is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature

-4-

of the conduct or that the circumstances exist." *Id.* § 39-11-302(b). "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." *Id.* § 39-17-419. "Other relevant facts" to support an inference of intent to sell or deliver include the weight and street value of the drugs, the packaging of the drugs, the presence of a large amount of cash, and the presence of weapons. *See State v. Nelson*, 275 S.W.3d 851, 867 (Tenn. Crim. App. 2008) (sufficient circumstances from which the jury could reasonably infer that the defendant intended to sell the cocaine when defendant was spotted in a location known for illegal drug sales, in possession of cocaine inconsistent with personal use, coupled with $114 in cash and a check for an unspecified amount); *State v. Brown*, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (the absence of drug paraphernalia and the manner of packaging of drugs supported an inference of intent to sell); *State v. Matthews*, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (finding testimony of amount and street value of 30.5 grams of cocaine was admissible to infer an intent to distribute).

"A person commits an offense who unlawfully possesses a firearm . . . and . . . [h]as been convicted of a felony crime of violence . . . or a felony involving use of a deadly weapon." *Id.* § 39-17-1307(b)(1)(A). Aggravated burglary is a "crime of violence." *Id.* § 38-17-1301(3). "It is an offense to possess a firearm or antique firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." *Id.* § 39-17-1324(a). "As used in this section, unless the context otherwise requires . . . '[d]angerous felony' means . . . [a] felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance." *Id.* § 39-17-1324(i)(1)(L).

Tennessee courts recognize that possession may be either actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). A person constructively possesses a controlled substance when he or she has "the power and intention at a given time to exercise dominion and control over [the contraband] either directly or through others." *Id.* at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 445 (Tenn. Crim. App. 1997)). Said differently, constructive possession is the "ability to reduce an object to actual possession." *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]he mere presence of a person in an area where drugs are discovered is not, alone, sufficient." *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000) (citing Cooper, 736 S.W.2d at 129). "Likewise, mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to support a finding that the person possessed the drugs." *Cooper*, 736 S.W.2d at 129.

"Possession need not be exclusive and may be exercised jointly with more than one person." *State v. Richards*, 286 S.W.3d 873, 885 (Tenn. 2009) (citations omitted).

When, as here, an "accused is not in exclusive possession of the place where the controlled substance is found, additional incriminating facts and circumstances must be presented" that "affirmatively link the accused to the controlled substance." *Id.* Such facts and circumstances include:

> (1) whether the drugs were in plain view[;] (2) whether contraband was in close proximity to the defendant[;] (3) conduct on the part of the defendant indicative of guilt, including furtive gestures and flight; (4) the quantity of drugs present; (5) the proximity of the defendant's effects to the contraband; (6) the presence of drug paraphernalia; (7) whether the defendant was under the influence of or possessed additional narcotics; (8) the defendant's relationship to the premises; and (9) incriminating statements made by the defendant.

*Id.* at 885-86 (footnotes omitted).

The evidence adduced at trial established that the defendant reported 272 Talbot Street as his residence and identified one of the bedrooms as his during the search. Ammunition located inside the defendant's bedroom matched the caliber of the handgun found alongside the marijuana and digital scales inside the oven. In the recorded telephone call, the defendant indicated that the others in the residence were there to purchase marijuana. The amount of marijuana, 21.3 grams, exceeded that typically possessed for personal use, and officers did not discover any drug paraphernalia in the residence. This evidence was sufficient to support a conclusion that the defendant possessed the marijuana and that he did so with the intent to deliver it. The absence of forensic evidence linking the defendant to the marijuana does not alter our conclusion that the defendant constructively possessed the drugs. Similarly, the same facts support a conclusion that the defendant constructively possessed the firearm discovered inside the oven.

## II. Mistrial

Prior to trial, the defendant moved the trial court "to prohibit the prosecutor or any of the prosecution's witnesses from mentioning or referring to the fact that the defendant was on probation or parole and that they were performing a search because of his status." The trial court heard the motion on the morning of the defendant's November 18, 2020 trial. The defendant explained that the charges arose from a residential search conducted because both the defendant and the person with whom he was living were registered sex offenders. The defendant argued that his status as a sex offender was irrelevant to the issues presented at trial and that any probative value in evidence of his

-6-

status was outweighed by the danger of unfair prejudice. The State confirmed that the officers were at defendant's residence to conduct a sex offender registry check.

The trial court agreed that the defendant's status as a sex offender was irrelevant and granted the defendant's motion, stating, "I'm not going to allow the State to ask any of its witnesses about him being on the sex offender registry or that they are there to conduct any search pursuant to any kind of sex offender registry." The court ruled that the probation officers who conducted the search would be permitted to testify that they worked for "The Department of Probation and Parole" and that the police officers who participated in the search could testify that "they are with law enforcement." The court emphasized: "I don't want them mentioning anything about he's on probation or anything like that. They can just mention they work for the Department of Probation and Parole. They were there and, you know, they came in contact with [the defendant]." When the prosecutor indicated that he intended to ask the officers "just basically just who they are with, if they are with [the] Board of Probation and Parole," "[i]f they are familiar with" the defendant, "[a]nd if part of their job responsibilities . . . encompasses searching -- conducting home checks on individuals," the trial court replied:

> They don't have to say that. They can just say that we were there to do a home visit or whatever they want to say and as part of our duties we have the right to search his residence. Okay? I mean, you can refer to it as a home visit. That's what they are really there doing is make sure he's home and make sure he's following the rules or whatever . . . . I think it is important for the jury to understand that they are there and they have the right to be there and they have the right to search his home.

The trial court noted for the record that those witnesses to whom the ruling applied were "in the courtroom listening" to the discussion and instructed the witnesses

> not to mention anything about the sex offender registry or him being on the sex offender registry or that they were there because he's a sex offender or anything of that nature. That would be improper. But I will allow the witnesses to testify about who they work with and they are there to do a home visit to I guess come into contact with [defendant] and that they do have -- as part of their responsibilities they have the right to do a home search.

After the State asked for clarification of the court's ruling, the court reiterated,

> Now, you know, as I said they can be asked, you know, who do you work for?  Are you acquainted with [the defendant]?  Back on this date did you have occasion to go to whatever address and what was the purpose?  I assume it was to do a home curfew check or whatever they may say and then go from there.  You don't have to get in to he's on probation and he's signed something giving them permission to search his house.

The court reiterated that its ruling "applie[d] to all of the law enforcement officers and applies to all of the probation and parole officers.  Don't mention any of those other matters."

Despite the trial court's explicit and thorough ruling, the following colloquy occurred after Mr. Miller testified that he was "a probation and parole officer for the Tennessee Department of Corrections":

> The State:    Okay.    What exactly are your job responsibilities?
>
> Officer Miller:    I am an – I work in the PSU unit which supervises registered sex offenders.
>
> The State:    And as part of your job responsibilities, do you conduct resident searches?
>
> Officer Miller:    I do.
>
> The State:    And what is the purpose of that?
>
> Officer Miller:    Resident searches are just to make sure anybody under supervision is in compliance with all their rules and conditions.
>
> The State:    Are you familiar with [the defendant]?
>
> Officer Miller:    I am.

The defendant objected. The prosecutor apologized and explained that because Mr. Miller was in the courtroom when the trial court made its ruling and instructed the witnesses not to mention the sex offender registry, he had "assumed he would leave that out." The prosecutor emphasized that it was "not his intent to try to back door the ruling." The trial court did not find that the prosecutor tried to undermine the court's ruling but noted, "[W]hen you ask a general question about what are your duties, I mean, in a general sense he's going to tell you what his duties are." The defendant moved the court for a mistrial, noting the trial court's very recent and very specific ruling. The defendant argued that, although Mr. Miller did not say that the defendant was a sex offender, "the implication is that he was on the sex offender registry from what he said." The defendant declined the trial court's offer to "instruct the jury to disregard that comment," insisting "that the comment blurted out is just very prejudicial" and that such an instruction would only serve to emphasize the issue. The trial court denied the motion for a mistrial, noting in particular that Mr. Miller did not say "specifically" that he supervised the defendant as a sex offender.

Later, after Mr. Miller testified that the defendant "was not under my supervision personally," the trial court expounded on the earlier denial:

> I just want to put that on the record because, again, you know, I have to look at this in terms of whether or not that was prejudicial or not and since he did testify that the defendant was not under his supervision then, you know, certainly I wouldn't think the jury would try to infer that he was on the sex offender registry.

On appeal, the defendant challenges the trial court's ruling denying a mistrial. The State contends that the trial court did not abuse its discretion because the defendant failed to show manifest necessity for a mistrial.

"The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "In making the determination whether a mistrial is warranted, 'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009) (quoting *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993)). "The burden

-9-

of establishing the necessity of a mistrial lies with the party seeking it." *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008) (citing *State v. Reid*, 91 S.W.3d 247, 342 (Tenn. 2002)). Because the decision to grant or deny a mistrial lies solely within the trial court's discretion, we review the ruling of the trial court under an abuse of discretion standard. *See State v. Bell*, 512 S.W.3d 167, 187 (Tenn. 2015) (citing *Reid*, 91 S.W.3d at 279).

> Our supreme court
>
> has recognized three nonexclusive factors that a reviewing court should consider when determining whether the trial court should have granted a mistrial because of inappropriate testimony before the jury: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof."

*Bell*, 512 S.W.3d at 188 (quoting *Nash*, 294 S.W.3d at 547). Importantly, these "factors while often helpful, may not be applicable in every instance." *Nash*, 294 S.W.3d at 547 n.4.

Here, the challenged testimony came in direct response to the prosecutor's request that Mr. Miller describe "exactly" his "job responsibilities." The prosecutor had been warned by the trial court during the hearing on the motion in limine that the State need not "get into" the employment responsibilities of the officers who conducted the search of the defendant's residence. The defendant did not, at any point, challenge the validity of the search or raise any issue with regard to the officers' right to search his residence. Mr. Miller's job responsibilities were irrelevant to the issues at trial, *see* Tenn. R. Evid. 401, and the prosecutor's question only served as an invitation to present irrelevant and inadmissible evidence to the jury. Moreover, as the trial court observed, "when you ask a general question about what are your duties, I mean, in a general sense he's going to tell you what his duties are." Although the prosecutor might not have intended Mr. Miller to say that he supervised sex offenders, he was certainly aware that that was what Mr. Miller's job entailed.

The trial court offered to instruct the jury to disregard the comment, but the defendant declined, observing that such an instruction would only serve to draw the jury's attention to the issue. The court's offer of a curative instruction and the defendant's subsequent refusal "for tactical reasons" are typically "significant to the analysis" when considering the refusal to grant a mistrial. *Nash*, 294 S.W.3d at 547. This is not an instance, however, when the defendant did not attempt to prevent the admission of such

-10-

testimony. He filed a motion in limine, which the trial court granted in the most forceful language possible. He asked the trial court to specifically instruct the witnesses not to make any reference at all to the sexual offender registry. At that point, the defendant had done all he could to prevent the admission of any evidence related to his being on the sex offender registry. Thus, Mr. Miller's testimony, which clearly implied that the defendant was on the sex offender registry, was so irrelevant and inflammatory that counsel correctly surmised that a curative instruction would only serve to draw more attention to the issue. Given that the three factors outlined above are not mandatory and given counsel's efforts to exclude the evidence prior to trial, we are not prepared to fault counsel for being hesitant to draw more attention to the inadmissible testimony.

Finally, we turn to the evidence of the defendant's guilt of the charged offenses. To be sure, the State presented sufficient evidence to support the defendant's convictions. We hesitate, however, to declare the evidence of his guilt overwhelming. Moreover, we observe that at the time the statement was uttered, the State had presented no evidence of the defendant's guilt. Mr. Miller was the State's first witness, and his revelation that he supervised sex offenders was only the fifth statement he made during his testimony. Consequently, evidence that Mr. Miller supervised sex offenders and that he was familiar with the defendant through his work colored the entirety of the trial. The revelation was exacerbated when Officer Jaggars testified that he responded to the defendant's residence to assist "another agency with a probation" and Officer Compton testified that he was "dispatched to assist probation and parole on a home visit." Both officers' testimony violated the trial court's ruling that no witness should "mention[] anything about he's on probation or anything like that." Moreover, the clear implication of this testimony was that the defendant was on probation for an offense other than those for which he was on trial and, given Mr. Miller's description of his job duties, the further implication was that the other offense had landed the defendant on the sex offender registry.

We also note that, in addition to this evidence from which the jury could surmise that the defendant had been previously convicted of other offenses, the trial court refused the defendant's request to hold a bifurcated proceeding to determine his guilt of the offense of possessing a firearm after having been previously convicted of a felony crime of violence. This court has repeatedly observed "that the better procedure" in such circumstances is "to bifurcate the proceedings and address the unlawful possession of a firearm charge separately." *State v. Foust*, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015). Thus, evidence of the defendant's criminal history hung like a cloud over the entirety of the trial. Given the timing of Mr. Miller's testimony, the fact that the testimony came in response to a question by the State and in direct contravention of the trial court's recent and explicit ruling, and the explosive nature of a revelation that the defendant was a sex offender, it is our view that the trial court abused its discretion by denying the defendant's

-11-

motion for mistrial.  We reverse the judgments of the trial court and remand the case for a new trial.

### III.  Conclusion

Accordingly, the judgments of the trial court are reversed, and the case is remanded for a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE